IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03045-MEH

CATHERINE HANNIGAN,

    Plaintiff,

v.

ANDREW SAUL, Commissioner of the Social Security Administration,

    Defendant.

## ORDER

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff Catherine Hannigan appeals the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **affirms** the ALJ's decision.

## BACKGROUND

### I.    Procedural History

    Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB filed on September 22, 2016. [Administrative Record ("AR") 141-42] After the application was initially denied on March 17, 2017 [AR 76-78], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for October 29, 2018 [AR 101-05], at which Plaintiff was represented by counsel, and the Plaintiff and a vocational expert ("VE") testified.

[AR 32-47] The ALJ issued a written ruling on January 14, 2019, finding Plaintiff was not disabled starting from February 5, 2016 because considering Plaintiff's age, experience, and residual functional capacity, she could perform jobs existing in significant numbers in the national economy. [AR 13-31] Plaintiff appealed the decision [AR 138-40] and, on August 27, 2019, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 2-7]. *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on July 22, 1957; she was 59 years old when she filed her application for DIB on September 22, 2016. [AR 141] Plaintiff claims she became disabled on February 5, 2016 [*Id.*] and reported that she was limited in her ability to work due to bilateral wrist pain, anxiety, vertigo, and major depression. [AR 161] On January 13, 2017, Plaintiff filed a "Function Report," in which she explained that her illnesses, injuries, and conditions limited her ability to work because "[she] ha[s] no self-confidence after working thirty-five years of [her] life giving 200% and end up getting walked out for something [she] didn't do. [She] pushed [her]self everyday to be the best and now she [has] given up[;] don't even care if [she] were here anymore! [She] used to love people now [she] do[es]n't trust anyone but family." [AR 48, 174]

On appeal, Plaintiff does not dispute the ALJ's findings regarding her physical conditions or functional abilities. The following records pertain to Plaintiff's mental health and are relevant to the issue she raises in this appeal.

The record indicates that on January 20, 2016, Plaintiff presented to Derrick Hurst, D.O., at Mountain View Medical Group to review her medications as it had been five months since she had last been seen. [AR 250] Plaintiff reported that her insomnia was worse but her anxiety was controlled by her current medications. [AR 251] The practitioner reported Plaintiff's mood, attention span, and concentrating were all normal. [AR 254] Among other conditions, Dr. Hurst assessed Plaintiff with anxiety, which was unchanged since her last appointment, and insomnia, which had deteriorated. [AR 256-57] Plaintiff next presented to Dr. Hurst on August 10, 2016, regarding sinus issues. [AR 242] At that appointment, Plaintiff reported she was depressed over losing her job, was trying to locate a new job, and was sleeping about five hours a night. [*Id.*] Dr. Hurst changed his assessment of anxiety to generalized anxiety disorder and increased Plaintiff's prescription for bupropion. [AR 248-49] Plaintiff presented to Dr. Hurst for a follow-up appointment on October 25, 2016. [AR 236, 344] She reported having anxiety, depression, and panic attacks. [*Id.*] After a general exam, the practitioner noted Plaintiff was anxious. [AR 254, 347] Dr. Hurst assessed Plaintiff with generalized anxiety disorder, insomnia, headaches, and severe major depression, all of which were unchanged since Plaintiff's last visit. [AR 239-240] Plaintiff was directed to continue her current medications as prescribed. [*Id.*]

At her October 25, 2016 appointment with Dr. Hurst, Plaintiff presented the doctor with paperwork related to her disability claim. [AR 236] Dr. Hurst completed a form titled "Medical Source Statement – Mental" for Plaintiff. [AR 299-301] On that form Dr. Hurst stated he began treating Plaintiff in 2007 and had treated her for generalized anxiety disorder, chronic depression, and chronic headaches. [AR 299] He opined that Plaintiff's symptoms, such as daily headaches, daily panic attacks, emotional distress, and chronic insomnia, would interfere with Plaintiff's

3

ability to retain employment if she became employed. [*Id*.] He further opined her symptoms extremely impaired her ability to perform the activities of daily living, markedly impaired her ability to maintain social functioning, and extremely impaired her ability to maintain concentration and pace. [AR 299-300] Dr. Hurst also estimated that Plaintiff would miss work more than four times per month due to psychologically based symptoms if she became employed. [AR 300]

On February 6, 2017, Victor Neufeld, Ph.D., conducted a psychological evaluation of Plaintiff. [AR 302] In addition to interviewing Plaintiff, Dr. Neufeld reviewed Plaintiff's medical records, her Adult Function Report, and the Claimant History Form. [*Id*.] Plaintiff reported she had become depressed after losing her stepdaughter but was "devastated" and became "extremely depressed" when she unexpectedly lost her job in 2016; she had difficulty with concentration, multitasking, and sleep since losing her job; she avoided shopping at times when there was a higher chance she might see old coworkers; and she no longer had any hobbies or leisure activities and seldom saw her friends. [*Id*.] Dr. Neufeld noted that although Plaintiff had been diagnosed with anxiety and depression outside of taking medications, she had no history of mental health treatment. [AR 303] He found Plaintiff's presentation "remarkable" given the amount of time she perseverated over her job loss, its impact on her, and how devastated and angry she was. [*Id*.] Plaintiff described her mood as depressed and scared, and said she felt sad most of the time, had trouble with motivation and enjoyment, and frequently felt like crying. [*Id*.] When asked if she felt hopeless, Plaintiff said, "I don't want to say hopeless. I want to move on with my life." [*Id*.] She no longer thought she would "rather be[] dead," as she had once had. [*Id*.] Dr. Neufeld observed Plaintiff exhibited some ability to think in an abstract manner, adequate working memory abilities, mild to moderate memory impairment, and above-average arithmetic calculation abilities.

[*Id.*] Dr. Neufeld concluded Plaintiff had moderate difficulty with recalling instructions due to the intensity of her emotional distress; marked impairment in social interaction due to anxiety and depression; moderate impairment in persistence and pace due to depression and anxiety; and moderate impairment in flexibility and adaptation due to her depression and anxiety. [AR 304]

On February 15, 2017, state agency psychological consultant Mark Suyeishi, Psy.D., issued a mental residual functional capacity assessment after reviewing Plaintiff's record. [AR 66-68] Dr. Suyeishi determined that Plaintiff was moderately limited in her ability to (1) interact appropriately with the general public; (2) accept instruction and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [AR 67] He opined that Plaintiff cannot work closely with supervisors or coworkers, but can accept supervision and relate to coworkers if the contact is not frequent or prolonged. [AR 68]

Edwin Baca, M.D., conducted a consultative examination of Plaintiff on March 2, 2017. [AR 309] Plaintiff reported her current loss of function in life was moderate to severe and primarily due to the severity of her depression. [*Id.*] She explained that she was formally diagnosed and began medication for the condition in 2011, but it was exacerbated by losing her job in February 2016. [AR 310] Dr. Baca noted that Plaintiff was followed by her primary care provider, Dr. Hurst, for her current problems and that she was undergoing routine medical management for treatment. [AR 309, 301]

On March 6, 2017, Plaintiff presented to Dr. Hurst for a follow-up appointment regarding her medications. [AR 338] She complained of anxiety and depression. [AR 341] The doctor's assessment included "unchanged" severe major depression. [AR 341] She presented to Dr. Hurst

5

for her annual physical on April 26, 2017. [AR 331] At that appointment she reported "no new concerns" and presented with normal mood, affect, attention span, and concentration. [AR 331, 335] On March 27, 2018, Plaintiff presented to Dr. Hurst for another follow up appointment at which she provided him with additional paperwork related to her disability claim. [AR 320] Plaintiff reported she had crying spells and still experienced anxiety and depression. [*Id*.] After a general physical exam, the practitioner noted Plaintiff had a depressed affect and was anxious. [AR 323] Dr. Hurst's assessment of Plaintiff included "severe major depression without psychotic features" and "generalized anxiety disorder," both of which were unchanged. [AR 323-33]

On March 28, 2018, Dr. Hurst filled out another "Medical Source Statement – Mental" form. [AR 316-318] He indicated he had treated Plaintiff for generalized anxiety disorder and major depression. [AR 316] He opined that Plaintiff's symptoms, including anxiety, depression, fatigue, poor sleep, and decreased motivation, would interfere with Plaintiff's ability to retain employment. [*Id*.] He further opined her symptoms markedly impaired her ability to perform the activities of daily living and to maintain concentration and pace, and moderately impaired her ability to maintain social functioning. [AR 299-300] Dr. Hurst also estimated that Plaintiff would miss work more than four times per month due to psychologically based symptoms. [AR 317]

### III.    Hearing Testimony

On October 29, 2018, Plaintiff (represented by counsel) and a VE testified before an ALJ at a hearing on Plaintiff's DIB application. [AR 32-47]

Plaintiff testified she had not worked since February 5, 2016; she previously worked as an inventory control manager for Johnson and Johnson; she worked there for thirty-five years; she worked her way up "from the depths" to that management position, which she held for the last

fifteen years of her employment; in that role, she supervised thirty-five people and managed a warehouse; she had problems with her hands and wrists; it was difficult for her to grasp things like cups or dishes and her hand sometimes went numb while writing; she had problems with dizziness and vertigo that came on randomly and continued with a constant headache; she had issues with dizziness "about half the month" and headaches daily; she took prescription medication for depression and anxiety and over-the-counter medication, such as Tylenol, for her headaches; she had been on medication since she lost her job; everyday she had "thoughts of not wanting to be here anymore"; she had "very bad" dreams at night about when she used to work; she did not go to therapy because she could not afford it; some days she did not do anything and laid in bed; other days she got up, made coffee, and vacuumed if she "really g[ot] rambunctious"; she needed a maid to clean everything else; once in a while a friend came to bring meals and clean dishes; her mother moved in with her after her father passed away; her mother was eighty-two years old and used a walker; she made sure her mother did not fall and helped her mother "with everything"; they lived in a one-level townhouse; the only person she interacted with on a regular basis besides her mother, her one friend, and her medical providers was her brother; if she went to the grocery store, she would go at night because she was afraid of seeing people she knew; she did not think she would be able to perform the same type of work she had been doing previously if offered the opportunity to go back to work because she had become extremely forgetful and her arms went numb when she lifted them over her head; during a normal day, she laid down for one to three hours due to fatigue or dizziness; she experienced side effects from the medications she was taking; and she did not have health insurance and last had health insurance on February 5, 2016. [AR 37-44]

The ALJ then turned to the VE, Bruce Magnuson, who testified that an individual with Plaintiff's age, education, and vocational background and the following limitations –

> This person could perform work at the medium or exertional level; They should never climb ladders, ropes or scaffolds, be exposed to unprotected heights or hazardous machinery. The person is limited to simple routine tasks with no fast[-]paced production work. There can be occasional changes to the work setting, Occasional interaction with coworkers and supervisors, but rate interaction with the general public, . . . define[d] as less than 10% of the workday.

– could not perform Plaintiff's past jobs but could perform the jobs of "kitchen helper," "sandwich maker," and "laborer, storage or warehouse worker"; if the limitations were further restricted to work at the light level, there would be no transferrable skills from Plaintiff's past work that would transfer into a job that meets that hypothesis. [AR 45-46]

The ALJ issued an unfavorable decision on January 14, 2019. [AR 13-31]

## **LEGAL STANDARDS**

To qualify for benefits under sections 216(i) and 223 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423.

### I.  SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. § 416.920(g).

## II.   Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287

F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). Reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Hamlin*, 365 F.3d at 1214 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability, February 5, 2016 (Step One). [AR 18] Further, the ALJ determined that Plaintiff had the following severe impairments: depression; anxiety; headaches; and vertigo (Step Two). [*Id.*] Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 19]

The ALJ then determined that Plaintiff had the RFC to perform medium work with the following limitations: the claimant must never climb ladders, ropes, or scaffold and must avoid exposure to unprotected heights and hazardous machinery; is limited to simple, routine tasks and must avoid fast-paced production work; is limited to only occasional changes in the work setting; can have only occasional interaction with coworkers and supervisors, and only rare interaction with the general public, with rare being defined as less than 10% of the workday. [AR 22] The ALJ found "[a]fter careful consideration of the evidence, . . . that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [AR 23]

The ALJ then found the Plaintiff was unable to perform any of her past relevant work (Step Four). [AR 25] The ALJ proceeded to determine that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there were jobs in the national economy that Plaintiff could perform, such as "kitchen helper," "sandwich maker," and "warehouse worker." [AR 26] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 27]

Plaintiff sought review of the ALJ's decision by the Appeals Council on March 14, 2019. [AR 138-40] On August 27, 2019, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 2] Plaintiff timely filed her Complaint in this matter on October 24, 2019.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges one error: that the RFC is not supported by substantial evidence because the ALJ failed to reconcile the opinion of consulting examiner Dr. Neufeld.

## ANALYSIS

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because she gave consulting examiner Dr. Neufeld's opinion significant weight but "failed to properly explain why certain limitations found within the opinion were not adopted." Pl.'s Opening Brief 7, ECF 11. In particular, Plaintiff is concerned with Dr. Neufeld's opinion, the ALJ's findings, and the RFC determination regarding Plaintiff's ability to interact with others socially. Dr. Neufeld found Plaintiff "has marked impairment in social interaction due to anxiety and depression." [AR 304] The ALJ, based in part on Dr. Neufeld's opinion, found that Plaintiff has a marked limitation in the functional area of interacting with others. [AR 20] The RFC determination included limitations that Plaintiff "can have only occasional interaction with coworkers and supervisors, and only rare interaction with the general public, with rare being defined as less than 10% of the workday." [AR 22] Plaintiff argues that the ALJ failed to explain why marked social limitations were applied to interactions with the public, and not coworkers or supervisors. She also contends that such a failure was harmful.

Defendant responds that the ALJ's RFC determination is supported by substantial evidence and, therefore, must be affirmed. First, Defendant claims that the ALJ reasonably considered the record as a whole and notes that her mental RFC finding was more limited than the only opinion in the record—by state agency psychologist Dr. Suyeishi—that squarely addressed Plaintiff's work-related mental functional abilities. Defendant asserts that Plaintiff's argument attempts to

overextend Dr. Neufeld's statement because it is about Plaintiff's overall ability to interact with others, not specific work-related social limitations, of which Defendant notes the doctor made none. Lastly, Defendant argues that the RFC finding—i.e., Plaintiff is limited to only occasional interaction with coworkers and supervisors, and only rare interaction with the general public—is not inconsistent with Dr. Neufeld's broad statement that Plaintiff has marked impairment in social interaction.

Plaintiff replies that Defendant's argument is "incredibly illogical" as Dr. Neufeld's opinion that Plaintiff has marked limitations interacting with others applies to all social situations, including work-related social situations. She argues the ALJ must explain why she variably applied this limitation and that, without such an explanation, the Court cannot assess whether the evidence supports the ALJ's conclusion.

"An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability," *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007), and if she "had decided to omit particular limitations embodied in the [] medical opinions, the [ALJ] needed to explain the omissions." *Parker v. Comm'r, SSA*, 772 F. App'x 613, 615 (10th Cir. 2019). In this case, the ALJ did not pick and choose through the record or omit particular limitations included in Dr. Neufeld's opinion. Although the ALJ gave Dr. Neufeld's opinion "significant weight," the RFC determination did not need to exactly match his conclusions because "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). While the RFC determination here did not precisely match Dr. Neufeld's conclusion that Plaintiff "has marked impairment in social

interaction," contrary to Plaintiff's characterizations, it was even further limited than necessary to comport with the significant weight the ALJ afforded his opinion. Rather than limit Plaintiff to only occasional interaction with other people to account for her marked limitation, the ALJ further limited the RFC so that Plaintiff's interaction with the general public was rare. "[I]f a medical opinion . . . has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit." *Chapo*, 682 F.3d at 1288.

Plaintiff relies on cases factually distinct from the circumstance at hand to support her general contention that the ALJ committed "harmful error" in setting more stringent limitations on her interaction with the public. In *Parker*, for example, the ALJ expressed no disagreement with the opinions of the state agency medical and psychological consulting doctors which had been given "significant" and "great" weight respectively. *Parker*, 772 F. App'x at 615-16. Despite this seeming wholesale adoption, the ALJ's ultimate conclusions entirely omitted or were directly at odds with the doctors' opinions. *Id*. ("Dr. Degroot opined that Mr. Parker was moderately impaired in his abilities to respond appropriately to usual work situations and to changes in the usual work setting. This impairment, however, was omitted in the agency's findings."); *id*. ("Dr. Ryan had opined (1) that Mr. Parker could not work closely with supervisors and coworkers and (2) that he could only accept supervision or relate to coworkers if the contact were infrequent. But the agency ultimately concluded that Mr. Parker could *frequently* interact with supervisors and coworkers." (emphasis added)). In *Chapo*, the ALJ committed a reversible error by adopting one restriction from the mental RFC determination of an examining consultative doctor, but discounting the rest of his limitations "with no explanation at all as to why one part of his opinion was creditable and the rest was not." *Chapo*, 682 F.3d at 1291-92. Unlike these scenarios, the

ALJ in this case did not entirely omit some of the conclusions in Dr. Neufeld's opinion, she did not adopt RFC limitations directly at odds with his findings, and she did not selectively apply some of his conclusions and reject others without explanation. As noted above, such "picking and choosing" did not occur in this case, particularly where the ALJ applied further restrictions in the final RFC determination.

## **CONCLUSION**

In sum, the Court concludes that the ALJ's RFC determination sufficiently accounted for Dr. Neufeld's conclusions and is supported by substantial evidence. Therefore, the decision of the ALJ that Plaintiff Catherine Hannigan was not disabled since February 5, 2016 is **affirmed**.

Dated at Denver, Colorado this 23rd day of April, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge